Good morning, Judge Bress. May it please the court. Eric McArthur for the federal defendants. I would like to reserve three minutes for rebuttal if I may. This case concerns two executive orders that direct federal agencies to the extent permitted by law to limit federal funding of medical institutions that perform sex transition procedures on minors and to ensure that federal funds are not used to promote gender ideology. The most salient aspect of this case is that rather than await any particular agency action implementing the executive orders, plaintiffs brought a facial challenge to the executive orders themselves. That fact has implications both for the justiciability of the case and for the standard that plaintiffs must meet to prevail on the merits. You can clarify the timeline here for me just to make sure. So there were the executive orders, correct? They were a few days apart if I remember correctly. That's right. I think one was on January 20th. And then a few days later there was an implementation where the states were notified that they were taking action immediately, correct? So there were two agency subcomponents that pretty quickly thereafter sent out notices that said this was a notice from HRSA and from the CDC, sent out notices to their grant recipients saying that these grant funds should no longer be used to promote gender ideology. Now, at what point did they file their lawsuit? It was shortly thereafter, I believe. Were either of those two orders still in effect at the time they filed their lawsuit? They may have been, but the key point – Well, that's my – you know, don't you? I actually don't recall specifically. You don't know the – I think it was February 11th is the time they were rescinded. One of them, at least one of them was in place, correct? That may be the case. Well, it was. Okay. But here's the key point. Okay. No, wait a minute. So when they filed their lawsuit, one of those orders was in place. Now, would you agree with that, that they had standing and the case was right at that time? I do not. Why not? The reason I do not is because they have not made any showing that their funding was at all affected by those notices. I'm talking about the time the lawsuit was filed. I'm talking about when those notices were in effect. I'm talking about when the – when do you look at – when do you evaluate standing? You evaluate standing at the time the lawsuit is filed.  So the order – those – that notice of action was in place. At least one of them was. We know that. But the question – Okay. No, wait a minute. So as I understand standing – and I'm not a great academic scholar here. But as I understand standing, basic – there was injury in fact, correct? No, that's – No, that's what you – so you disagree. So there was no injury in fact from the government's perspective. So therefore, we don't even have to get to rightness? Well, the constitutional aspect of rightness overlaps significantly with the injury prong of the standing. So let me – why wasn't there injury in fact? Because there is no showing that those notices affected their funding. Again, what the notice has said is do not use the funds that these agencies have granted to the recipients to promote gender ideology. If they had come in and shown we have those grants and we are using those funds to promote gender ideology, we are using those funds to subsidize these procedures and we have to stop because we got these notices, I agree. They would have standing there. They did not make that showing. Okay. So you – The fact – No injury in fact. That is correct. All right. It is not enough to say – In fact, and generally speaking as I understand it, rightness, at least the non-prudential part of rightness basically overlaps with injury in fact. This court has said that very often it is the case that they coincide, and I think that is the case here on the constitutional aspect. On the constitutional side. Okay. Now let me ask you this. When you think about rightness, it has a prudential part to it as well. So if I were to disagree with you, and I am not talking about anybody else, but if I were to conclude that the claims – that there was standing and that it was ripe at the time the claim was filed, what is it that makes it now all of a sudden unripe? So for purposes of that question, I'm assuming constitutional ripeness. I think there is still the prudential inquiry where you have to ask – That's what I'm asking you about. Are the issues – Why does it become unripe? I mean I always found that term to be – how can something be ripe and then become unripe? I was having a lengthy discussion with my law clerk about ripeness, and he said, well, you know, he said, Judge, think about a banana. A banana becomes ripe, and can it ever become unripe? So I don't think this dispute was ever ripe to begin with, but on the prudential factors you look to, are the issues fit for review at this stage, and is there any hardship to the plaintiff from awaiting review at a later stage? I think they have big problems on both of those. The issues at this stage of the case are entirely abstract and hypothetical, and let me if I may just –  Can I just – I'm having some trouble understanding why it's abstract or hypothetical when the order says shall terminate. The order does not say shall terminate. It says shall take appropriate steps consistent with law. And end. And end. It doesn't say end these grants. So the Defending Women Executive Order says as permitted by law, ensure that federal funds are not being used to promote gender ideology. But both executive orders contemplate an intervening step by the agencies to evaluate their statutory authorities, whether they have the authority at all to implement these policies, and if so, how. Let me give you one concrete example that I think illustrates this problem quite well. If you look at footnote 5 of the district court's opinion, you'll see there that the court premised standing for the state of Minnesota on the possibility that the federal government might implement these executive orders by prohibiting Medicaid reimbursements for these procedures. Okay? As it happens, in December, CMS did promulgate a notice of proposed rulemaking to prohibit Medicaid reimbursement for these sorts of sex transition procedures for minors. And as is typical in a notice of proposed rulemaking, the agency set out its statutory authorities that it was invoking, authorities that say the agency has to assure that Medicaid funds are used for procedures that meet standards of quality and are in the best interest of recipients. And it had a factual discussion about why these procedures, in their preliminary review, don't satisfy those standards. Now, what plaintiffs are essentially asking you to do in this case, in this case, is to pre-adjudicate that challenge. And not just that challenge, but countless other hypothetical disputes before the agencies had even proposed, let alone taken any action or set out what the statutory authorities they have or done the relevant legal and factual analysis to determine whether they can, in fact, implement the policies set out. Let me read this language to you. It's like I asked you, didn't I say, end the grants? And you say, no, no, they don't say that. So I look at the medical services order, Section 4, and it says, take appropriate steps to ensure the institutions receiving these grants end. And then the gender ideology one says, take steps to end federal funding. Then the other, Section 3 of the gender ideology, shall not be used. These are very clear. It's not a directive of like, think about this, figure out what you're going to do. It says, end, no more. So how could that be any clearer? This is like a pre-enforcement challenge where it says, you must do this. And you're now saying, well, but a lot of stuff could happen in between. But when you have mandatory language, that's to me what distinguishes this from some of the other cases cited in your brief. So I'd appreciate a response to that. The executive orders do not say you must do this full stop. What does end mean? They say, in effect, you must do this to the extent that you are permitted by law. So there is a directive. The president is directing them how to exercise any discretion that they have within the bounds of existing law. He is not directing them to take these steps regardless of the boundaries of existing law. And even if those steps would be inconsistent with the agency's statutory authorities, with the regulations, with the grant terms, he is, in effect, telling the agencies, I want you to do the analysis. Here's the general policy I'm setting forth. I would like to terminate federal funding for these sorts of procedures to the maximum extent permitted by law. Now, agencies, you go forth, and under your various statutes and grant programs, you determine to what extent you are permitted by law to implement that policy. And the mandatory part of that is once they've done that analysis and have concluded that they can, then they must. That is where the president is inserting himself. Maybe where we're having kind of a linguistic gulf here. Mr. McArthur, how does that compare to AFGE? Is the model the same in terms of the underlying executive order? Because that case, which started here, was then stayed by the Supreme Court. So I'm looking at what the Supreme Court did. I'm asking, is that what we have here, or are there any differences? I think it's very similar to the posture of AFGE, where the president had issued an executive order saying, we're going to do reductions in force as permitted by law, and the plaintiffs brought a challenge, said they're going to do this in a way that's illegal. And the Supreme Court said, you know, granted the government's stay motion because at that stage— Go ahead. I'm sorry. I didn't mean to even— At that stage, you couldn't tell whether the agency was going to actually do anything that was inconsistent with law, and the instruction that the executive order had given was perfectly lawful, as are the instructions here. So don't we know what they're going to do here? We don't. Well, I mean, two days or whatever, a few days after the executive orders are issued, out comes these orders and then followed by a press release. None of that— I mean, what's left to speculate about what they're going to do, what these agencies are going to do? I mean, it's pretty clear. It's not clear at all, Judge Pius, because the agencies haven't done— Well, what do you want—let me ask. I'm very frustrated because we do know that some action was taken, but yet from your perspective, you want us to disregard that, like it didn't happen. No, I'm not asking you to disregard that. First of all, there's been no showing that those notices that were issued were issued unlawfully. ABCDC and HRSA did a quick analysis and determined there's nothing in our statutes that requires us to continue funding gender ideology, and therefore for these— When those notices were rescinded, I thought that there was some— or maybe I read or maybe I—I read a lot here, and I can't keep it all straight, but I thought that when the notices were rescinded, part of it had to do with the fact that there had been some injunction issued by a district court out of New Jersey. That may be. I'm sure it's an injunction that we disagree with, but there's been no showing here. And that that was what prompted them to rescind the notices. Did I misread something? No, I think that is correct, but that doesn't change the fact that there has been no showing. Why didn't you argue mootness? Because their claims—they're not challenging those notices. They are bringing a facial challenge to the executive order. They're not challenging the notices that went out. Again, they have not shown that they were affected in any way by those notices, so they haven't even shown they would have standing to challenge those notices. They're saying, in effect, because agencies issued notices implementing the executive order that haven't been determined to be unlawful and that may have affected the funding of other parties not before the court, that they have injury, in fact, and a right challenge. That doesn't follow at all. Let me go back to the AFGE case. It seems that was very different because there the agencies are directed, in consultation with DOJ, to basically implement a large-scale reduction and to restructure various agencies. It's a very broad discretion. And here I'm having trouble seeing the same discretion because there it doesn't say eliminate this agency, eliminate these people. It says have consultation with DOJ, figure out what you want to do. And here the language that I read you says end, end, end, end. It's very different than AFGE. Do you have a better case than AFGE? Well, I think you could look at the Supreme Court's decision in Trump v. New York. That was a case where the president had issued a memorandum about apportionment policy and said, you know, to the maximum extent feasible and consistent with the discretion delegated to the executive branch. I want to exclude illegal aliens from the apportionment base. Well, I think in the—let's go back to that New York case. That's the noncitizens voting case. I think that case wasn't right because the order would not inexorably, as the court said, have a direct effect on the downstream access to funds or other resources. And you had these second-order harms, which we don't have here. This is a first-order harm. So I'm not sure that is convincing. Is there anything besides Trump v. New York or the AFGE case that supports the fact that this wouldn't be right? So there's the D.C. Circus decision in All Ball, which I think is on all fours. But let me take one more run at Trump v. New York. What the court said in that case was because the president's directive had included those qualifications, right, to the maximum extent feasible and consistent with the discretion delegated to the executive branch, the Supreme Court said those are real constraints that will affect the ultimate government action that will be taken in the future here. And we at this stage don't know how they will affect the ultimate government action that will be taken or even whether that government action will be taken. Some of the discussion has proceeded almost as though the district court dismissed the case as ripe, which it didn't. And so we can assume maybe that there's some aspect of the challenge, even the one here, that could be ripe. I guess the question is then how do we go from there to the scope of the order, which essentially invalidates the executive order, both of them, in every application? Right. So even if you get past the ripeness question, the fact that they brought a facial challenge does have implications about the merits, right? So one of those implications is that because they're not challenging any particular agency action and have said instead asserted a facial challenge to the order, they have to meet the burden of showing that there is not a single agency under a single statute administering a single grant program that could lawfully implement this executive order. They haven't even attempted to make that showing and they can't make that showing. That's number one. Number two, because there is no final agency action, they don't have a cause of action under the APA. The only cause of action that they can even potentially assert here is a net non-statutory ultra viris claim. And as the Supreme Court recently made clear in the Nuclear Regulatory Commission case, that is, in effect, a Hail Mary pass. There are very stringent requirements. How would you distinguish our case, the Sanctuary Cities case, city and county of San Francisco, which the district court relied on and which the plaintiffs relied on? Right. So the San Francisco case, number one, I don't think it expresses any disagreement with the general rule set out, for example, by the D.C. Circuit in the Albaugh case, that you do give effect to the sorts of qualifying language that we see in these two executive orders as consistent with law, as permitted by law. That's the general rule. That's the general presumption. I think San Francisco was a very narrow exception to that, where the court, in effect, concluded that in that case, based on particular aspects of that executive order and other facts in that case that aren't present here, the two were irreconcilable, that the savings clause language was simply irreconcilable with other aspects of the executive order that the court read as a categorical mandate to terminate all federal funds for Sanctuary Cities. Right. And I think they talked about withholding the funds. And here it says, end the grants. So I'm having some trouble understanding why the San Francisco case isn't controlling here, which I know never went up on cert to the Supreme Court, as I understand. It's not controlling because the various aspects that the court looked to, things like saying, well, in that case, there was an express carve-out for certain types of grants, and that gave rise to an expressio unius inference that all other grants had to be terminated. There was a specific direction to OMB to analyze grant, all grant funds to Sanctuary Cities. There was a fact that even before that executive order issued, the attorney general had already imposed those conditions on grants within the department's purview, and the government hadn't argued that there were any other grants that could permissibly be terminated or conditioned in that way. All of those were factors that the court in San Francisco expressly relied on, and they are not present here. But perhaps more fundamentally, I think it would be a serious mistake for this court to read San Francisco as broadly as the district court read it here, and as plaintiffs are urging you to read it. Number one, I think that would run you into conflict with the Supreme Court's decision in Trump v. New York, which says that these are real constraints and have real implications for how courts must review presidential directives. I think that would create a circuit split with the D.C. Circuit's decision in ALBA, and it would deprive the president of an essential tool that the president needs in order to exercise his supervisory authority under Article II over the executive branch. The president has to give policy directions in broad strokes. I don't know what the alternative here is that plaintiffs think the president should have done. Should the president himself have analyzed... I don't even know how many statutes are potentially at issue here. We have 15 agency defendants with who knows how many different grant programs under who knows how many different statutes. Obviously, the president, as the head of the executive branch, doesn't have the time to do all of that work. He sets the broad policy and gives the agencies the policy steer and leaves to them... So the president was not resting his decision to issue the executive orders on any one particular statute or statute. He just was exercising his authority, his presidential authority to set policy for the agencies. That is exactly right. He was exercising his core Article II authority to supervise his subordinates and say, here is the policy I want you to pursue to the maximum extent permitted by law. And if we're just going to treat that sort of language as boilerplate and meaningless, that's going to be a real problem for the president because it's not boilerplate and it's not meaningless. It's the president saying, here's the policy I want you to pursue, but I am also not telling you to do anything illegal. Yes, I want you to pursue this policy to the maximum extent permitted by law, but I also want you to respect the limits on your legal authority and not exceed them. That is all the president did here. Let me ask, you characterize this as a facial challenge, but then I read their briefs and I think they say it's an as-applied challenge. Do you think it matters in this case? I do think it matters because there's a very imposing standard they have to meet for a facial challenge. Again, they have to show that there are no circumstances in which any agency could lawfully implement this policy, and this is a paradigmatic facial challenge. They are not arguing that these executive orders are unlawful because of some way in which they could be applied to their particular factual circumstances. They are saying that on their face, they are unlawful in all of their applications, and they got an injunction that prohibits enforcement of these provisions of these two executive orders on their face. Why don't we hear from your opposing counsel? We'll put five minutes on the clock for rebuttal. Thank you.  Mr. Purcell, good morning. Good morning. May it please the court, Noah Purcell, on behalf of the plaintiffs' states and physicians. Your Honors, the executive orders that we challenge in this case are profoundly harmful and hateful, but for today's purposes what matters most is that they are unconstitutional under this Court's binding precedent. I want to start this morning by talking about separation of powers and then turn to equal protection if I can. So on separation of powers, this Court's decision in the city and county of San Francisco that several of you have asked about is dispositive and forecloses virtually every argument that the federal government is making here. That case held that the President lacks authority to add conditions to grants that are not authorized by statute, and that's exactly what the President is trying to do here. And two important points about that case highlight the absurd breadth of the administration's position in this case. So first of all, the administration is claiming for itself spending power that even Congress does not have. In the city and county of San Francisco, this Court carefully walked through the Supreme Court precedent and explained that even Congress, which has expressed spending power under the Constitution, cannot impose conditions that aren't clearly and unambiguously expressed in statute and cannot impose conditions unrelated to the underlying spending. I guess the issue here, right, is that agencies have all kinds of— there's a vast universe of how funding gets dispersed, prioritization of who we're going to fund over somebody else, defunding decisions, and these grants apply to probably thousands of different programs. And so you can see how on an individual basis somebody could come in and say, listen, taking this grant away from me, that violates this provision or that provision. But how can we go from kind of point A all the way to Z and say, well, we should enjoin all these executive orders as to everything without knowing any more about all the different restrictions or rules that could govern each one of these programs? There's a lot there, Your Honor, but let me start with this. So their position is essentially that we should have waited until some specific grant was terminated, and then we could have sued. And there's three very clear problems with that. So first is just precedent. City and county of San Francisco did not require that. In that case, the plaintiff sued before any specific grant funding had actually been taken away. This court said, that's fine, standing ripeness, because you're harmed by just the threat of losing that funding. You're being forced to choose between implementing your state policies and losing funding, and that harm is enough. And that is very true here, Your Honors. Hospitals all across the country stop providing gender-affirming care because of the threat of losing tens or hundreds of millions of dollars. They could not risk having to lay off staff, stop research, and so on. So that threat is happening right now. And that could be as to a particular program or a grant, but how can that be as to all grants for all time for all programs? Well, Your Honor, the next point I was going to make is that essentially the other thing that's incredibly hypocritical about the administration's position is if we had waited and challenged a particular grant termination, they would have said, you can't seek an injunction. You have to go to the Court of Federal Claims to challenge that grant termination, which cannot issue injunctive relief. Yeah, I guess I'm granting you a lot of what you're saying or maybe even all of it to say, well, look, you don't need to wait until the grant is terminated. You can go in preemptively perhaps, but the issue is more the scope of relief as to whether that leads to then invalidating the executive orders on their face as to these funding provisions. I understand. So a couple of points about that, Your Honor. So first of all, this is an as-applied challenge. The Supreme Court in Doe v. Reed described kind of the essentials of an as-applied challenge is that you're not seeking relief beyond your own circumstances. We are not seeking relief beyond our own circumstances. We are trying to protect ourselves in this case. If we win, the order can still be applied all across the country outside of our states and to physicians outside of our states. We are seeking relief as to our own harms. Now, statewide relief was necessary to achieve that because as the district court found at ER 55-56, simply providing relief to state institutions alone and state doctors alone would not be sufficient to remedy our harms. And so, for example, the University of Washington Medical Center, their faculty work at Seattle Children's Hospital extensively, which is not a state institution. Their students train there. They practice there. So just providing relief to UW would not be enough to address UW's harms. And for the physician plaintiffs, it's even more obvious that they have standing on behalf of their patients, as explained in the briefing and in the record. But I guess as to what programs, right, it's hard to call this an as-applied challenge when the effect of this is going to say this whole provision in this executive order cannot be applied in such a broad-based way. Your Honor, I respectfully disagree. It cannot be applied to us. It cannot be applied to us. It can be applied to others. We are bringing a suit to prevent our own harms. We only challenge specific provisions of these orders. Mr. McArthur brought up, you know, Section 5 of the order and what it might allow. We didn't even challenge that section. So we brought very narrow challenge to specific provisions that were having immediate impacts on us. It's an as-applied challenge, and the relief is appropriate because the relief was necessary to remedy our harms. I understand the crux of the government's argument is that despite my quotation of the mandatory provisions of the executive order, the government takes a position that they're still discretionary as permitted by law leeway, and therefore that bounces you out of this ripeness situation. What is the state's response to that? I think it just flies in the face of reality. I mean, the administration immediately sent out notices to thousands of grant recipients saying that their grants were terminated to the extent they conflicted with the executive order. Hospitals across the country immediately began eliminating programs, and the White House bragged that that was the purpose, that it was having its intended purpose. So the idea that there was some discretion to be exercised later, it just flies in the face of the way it was actually being implemented. This court addressed that exact argument in the city and county of San Francisco. I know my friend on the other side says that it's different somehow. If anything, I think it's more stark here because here there's not just this impending threat that everyone understands and is very clearly being communicated by officials up and down the administration. You have actual notices going out saying grants are being terminated, which had not happened yet in that case. And in that case, you had even a subsequent memo purporting to narrow the order where you have nothing like that here. How do we know if any of these terminations would even be unlawful? I mean, don't we need to look at the statutes and the regulations to understand all the terms and conditions of all these different programs? Your Honor, the burden is on the administration to show that they are acting within some statutory authority, that they are acting within... The president has authority to use discretion within grant programs where Congress has granted it. The president cannot just make up new policy priorities that are completely separated from congressional lawmaking. That just usurps Congress's power. The concern one would have, presidents issue these kinds of orders like this across administrations. All kinds of presidents issue orders saying, here's what I want to do, I want you to do it consistent with law. Go look into it and do it, and do it even immediately. To then take that and say, well, we're going to enjoin that practice before we have any understanding of how it's even going to unfold is a significant intrusion on executive authority. Your Honor, I respectfully disagree. Presidents certainly have issued executive orders over many decades, not like these, not like these ones. These ones just across the board attempt to establish nationwide health care policy in a way that no prior president has attempted to do. And if you think about the implications, the other side's theory essentially gives the president power to dictate health care policy nationwide on whatever topic he wants. He can set vaccine policy, gender-affirming care policy, medical malpractice policy by just saying, in any state that doesn't have my preferred approach, we're going to cut off all grant funding. I think the response to that would be, and then if he does, or if the agency does, then you sue. But again, Your Honor, the problem is the harm has already happened. States, I mean, it's happened in this case, right? States cannot, hospitals cannot afford to lay off hundreds of staff while they try to get their grant funding back. They can't stop research studies into cancer and Alzheimer's and diabetes midstream while they go to the Court of Federal Claims and try to get their money back. So how does this case then differ from the AFSCME case and the Trump v. New York case? I'm glad you asked that, Your Honor. So starting with the Trump v. New York case, in that case the president had directed the Census Bureau to prepare options for him about different ways he might apply the enumeration to exclude undocumented immigrants. The court found a lack of standing, a lack of causation there, because the president had not made any decisions, no options had been presented yet. It wasn't clear what the options would be, and it wasn't clear what impact the options would have on the different state plaintiffs. So there were multiple steps before any actual harm would happen. Here the harm began as soon as the president issued these orders. Hospitals and research institutions started changing their policies, cutting off care, the harms were happening, and that was not an accident. The president made very clear that was not an accident, both through the letters and the public statements. On AFG, you know, AFG is a two-paragraph unexplained order that simply says the plaintiffs are likely, or sorry, the defendants are likely to succeed on the merits. As Your Honor highlighted, it gave some broad direction to agencies about preparing reductions in force. It did not address in any detail separation of powers concerns or anything like that. And crucially, Your Honors, the other side is not arguing that city and county of San Francisco has been overruled, has been narrowed, has been superseded. I mean, that case is... Well, I think the argument from the government's perspective is it's just a very, very narrow case given the nature of the executive order. But it's clearly good law, right? It's clearly good law. They're not even arguing it's not good law, and I think, if anything, the executive orders here are more flagrantly contrary to the Constitution and more immediately causing harm than the orders there. So if it is narrow, this extreme example clearly falls within it because... Well, I mean, it's, you know, it... The Ninth Circuit cited it, you know, in the AFGE case that was then stayed by the Supreme Court, and so it's, I think, a question as to how much of it remains something the Supreme Court would approve given what Justice Sotomayor said in her separate concurrence in AFGE. But I guess the issue, I would say, is... Let's assume that some part of this is ripe and that there's some immediate concern here. There's still the question of, like, how should this dispute unfold in the courts? Because... And I think that's the concern I have, which is, is this the right way to handle this, to enjoin the whole thing up front, or should it be playing out in a more deliberate way with a more focused attention on different programs? Your Honor, the problem with that, and I apologize if I'm being a little repetitive here, is that the harms will have already happened. I mean, hospitals around the country would have to lay off staff. If they lose this grant funding and then have to go try to get it back, they will have to lay off staff, they will have to stop the midstream important research projects. And that was already happening, right? Hospitals were already making the decisions to terminate providing this kind of care to avoid those consequences. And it was only when we got the injunction in this case that our own states were protected from those harms. And so requiring us to wait until then would essentially be requiring us to suffer the very harms we're trying to prevent. And so that can't be right, and it's not right... The harm only... You have an immediate loss of funding or a threatened loss of funding, but the question is whether that's legal, right? And so how do we know that, you know, across all these things? That's the concern I have. Because, Your Honor, the president is trying to intrude on Congress's spending power. The president has to point to some statute that authorizes his exercise of discretion before he can remove funding or put conditions on grants. And again, you know, if that's not the rule, then the president can just set healthcare policy nationwide just through grant conditions. And, you know, I think, for example, the other side would have to agree that if a current president can do this, a next president who wants to take the opposite approach could say, you know what, only hospitals that provide gender-friendly care... Why wouldn't it depend on the terms of the specific program? Sorry, Your Honor? Why wouldn't it depend on the terms that you're making? You're arguing, well, the president can't do this, but how do we know that until we look and see, well, here's what the statute says, here's what that reg says? Your Honor, the other side has had a year to come up with any statute that even plausibly allows these conditions as to any grant, and they have not done that. I mean, they've had a year. They've had, you know, so much time to think about what statute could we cite to justify this as to any grant, and they haven't cited one. Wasn't this more like Youngstown? I mean, they had a potential statute, but even the president said, I'm not relying on that statute. I'm relying on my constitutional authority, and you can't sort of imply a statute after the fact. Right. So is this Youngstown? I mean, I think it's very close. I mean, you heard today that the president is not relying on any statute, right? And so that also highlights, I think, why it's so wrong to think that our claim is a disguised statutory claim. We are not bringing some disguised statutory ultraviarious claim. We have a constitutional separation of powers claim. So what should the president have done? Should the executive order have been like 100 pages and gone through every possible grant program that could be implicated, or is the president not allowed to offer this kind of general directive and say, but consistent with law? Your Honor, this would be a harder case if it were not intended to be implemented immediately and across the board in the way that it so clearly was and started to be. And if the president had simply given direction that he wanted agencies to prepare options consistent with law, identify grants or programs that statutes that they administered that might allow conditions like this, and then report back, and then they could make decisions after that. That is clearly not what the intention was. Sorry. Let me set aside there the equal protection problems that would be present. But in terms of the spending clause, if there were decisions to be made later after review of statutes and after identifying statutory authority, then there would be a plausible argument that the case was not ripe yet, that there wasn't a spending clause argument here. But that's very clearly not the reality on the ground. The president intended it to be implemented immediately. Agencies started implementing it immediately and across the board. The regulated entities understood it to be immediately effective and started reacting immediately and suffering the harms. So it just flies in the face of reality to say that this is all sort of some future theoretical to-be-determined later set of impacts. The impacts are now. And again, city and county of San Francisco talked about that very specifically in the context of standing and ripeness and saying the harm is now. The harm is being forced to choose between the loss of federal funding and your own long-standing policy priorities. On the statutory ultra various versus constitutional, as you've indicated, there's no specific statute implicated. And yet, I think the government does point to this recent Fourth Circuit case on sustainability in which there was, in effect, an implied statutory challenge related to the spending powers. What is your position on the applicability or distinction of that Fourth Circuit case? Thank you, Your Honor. So, the plaintiffs in that case had a wide range of arguments, and their primary arguments, as the Fourth Circuit understood them, were that there were certain statutes that forbade the government from cutting off their grants. And then they argued that because the president was violating those statutes, he was also violating the separation of powers. And it was because of that that the court treated that as essentially an attempt to end run around statutory limits on causes of action like that. That is not the situation here. We have only constitutional claims. Our separation of powers claim is a well-recognized, stand-alone type of constitutional claim. This court has recognized it. The Supreme Court has recognized it in the Free Enterprise case cited in our briefing. It's not a novel theory. It is a very straightforward claim. And all those ultra-various cases very clearly distinguish between constitutional claims, which parties can bring, and then sort of disguised, equitable statutory cause of action that try to evade statutory limits on those causes of action. That's not what we're doing here. Let me ask you, on the theme of the Fourth Circuit, there's another Fourth Circuit case, the National Association of Diversity Officers case, that got into some of these issues about as applied versus facial. Judge Diaz wrote about that. I don't know if you're familiar with that case, but how does that case differ from this one, if at all? Well, again, Your Honor, we are seeking relief only as to our own circumstances. If I recall correctly, that was seeking nationwide relief as to all possible applications. We are seeking relief as to our own circumstances. These provisions of these executive orders cannot constitutionally be applied to us. That's what we're asking for here. Even if we win, they can still be applied to others. I think that's where your brief says this is an as-applied challenge. The government says, well, it's really a facial challenge. Does it matter in the end? Your Honor, I think the framing of it does matter. I mean, we would urge the Court to find that it is an as-applied challenge because that makes much more straightforward what the overall approach is. But even if you apply that sort of language about no constitutional application, these provisions cannot constitutionally be applied to us because there is no authority for the President to impose these conditions. They have had a year to find any. They have cited none. There is no authority to apply these provisions to us. But again, we brought this as an as-applied challenge. It's intended to be an as-applied challenge. We are only seeking relief as to our own harms. And so that's what we think should make the difference in terms of how this Court views the case. And I'd also point out that Council talked about some provisions in Section 5 of one of the orders that are being implemented. We didn't challenge all the provisions in the orders. There are other provisions in these orders that they are currently implementing that we have not yet challenged. We may challenge how they turn out someday because we don't want to see too far into the future. But we will very likely disagree with the Administration's interpretation of some of the rules that come out of those processes and we will challenge them then. But these provisions were harming us right now. And so we challenge them now. And the City and County of San Francisco makes clear that we have standing to do that. I had a pretty discussion with Mr. McArthur about ripeness. And, you know, to me it looks like when the complaint was filed there was standing injury, in fact, and probably constitutional ripeness. But there's another part of ripeness that kicks in, which is prudential considerations. And as I listen to the discussion that you've had here, Judge Bress raises, you know, I think some sort of nuanced points that need to be dealt with, and which is, you know, the orders were rescinded, right? Well, the orders have not been rescinded. Not the orders. I meant the notices. The letters were rescinded. Because of injunctions. I mean, if the case hadn't been... But they were rescinded. Those letters are not enforced right now, correct? Fair enough, Your Honor. But that certainly would not, for example, lead to mootness because it's... I didn't say mootness. Did you hear me say mootness? Sorry, Your Honor. I didn't say mootness. I got ahead of myself. But in terms of prudential... I'm talking about the prudential aspects of ripeness. You know, as a court, shouldn't we take, you know, where things are at now, the nature of the challenge, the nature of the orders, and say, well, you know, maybe we need to let this sort of develop a little bit further. I would urge you not to think about it that way. Why? Because part of prudential ripeness is the hardship to the parties of withholding decision. And here, the hardship to the states and to the patients is immense, is life-changing. And so to withhold hundreds of millions of dollars in grant funding because of the President's threats is to force state institutions to lay off staff, to stop crucial research, is to force patients to forego life-saving treatment. And it's just there's no basis in law to require that, especially under this Court's decision in City and County of San Francisco, which also dealt with prudential ripeness. I know I'm over time. If I may just have 30 seconds to address the equal protection issue briefly, because we would urge the Court to resolve the case purely on separation of powers grounds because we think that's the most straightforward approach given the pending cases at the Supreme Court. But if the Court reaches equal protection, it should absolutely affirm the District Court on that aspect of the case because of the egregiously discriminatory nature of these orders. The big issue here is  Or Hecox. Fair enough. And again, we would encourage you to resolve it solely based on separation of powers. But Scrimeti, the Court found that the Tennessee law at issue there was targeting certain medical treatments and not individuals, not transgender individuals as such. There's no plausible argument that that is the case here. The gender ideology order threatens funding to any institution that simply acknowledges the existence of transgender individuals. There's no rational basis for that sort of rule other than discrimination. And the other order talks about life-saving medical care as child abuse, as mutilation, as maiming. The orders threaten prosecution of doctors and families. The District Court correctly found that these orders are riddled with animus, and that was certainly not a clearly erroneous finding. So, Your Honors, again, we would ask the Court to affirm the District Court's preliminary injunction unless there's any further questions. Thank you, Mr. Purcell. Mr. McArthur. I have just a few points, Judge Payaz. I do think there are serious prudential rightness considerations in this case, and there are two cases in particular that I would urge the Court to take a look at. One is the Supreme Court's decision in Texas v. United States. That goes to the question of whether the issues are fit for review at this stage. In that case, the Supreme Court said the nature of the challenge that Texas brought there would require the Court to speculate about every potential application of the Texas statute at issue there, and whether that would implicate the Federal Voting Rights Act. And the Court said we don't have the powers of imagination to do that, and the legal issues will be much better assessed, much better grasped in light of a particular application. The problem here is orders of magnitude worse than it was in Texas because it's not just one potential statute that we're trying to imagine what are the possible applications. It's a whole host. Who knows how many federal statutes and grant programs at issue. The other case that I would urge the Court to look at, this goes... The difficulty with that argument is to say because this order is so wide-sweeping, and because it's so clear as to who's targeted, and there could be so many institutions, we just throw up our hands and say not now. But doesn't that really ignore the harm to patients, hospitals, and doctors now? It doesn't, and that is the second aspect of the prudential ripeness inquiry, and I would encourage the Court to take a look at this Court's decision in the Colwell case. That was a prudential ripeness case where the agency had put out a guidance that said, you know, if you don't provide certain translation services to low English English proficiency patients, your funding is at risk and could be terminated, and the Court said that there was no hardship in actually awaiting an application if the agency in the context of an enforcement applied that guidance to terminate funding. They could raise all their defenses when it was actually applied. You don't see some difference between imminent medical care and a translation service in terms of hardship? Well, both of those cases concerned loss of funding. I don't think anyone... I understand they concern loss of funding, but the impact of the loss of funding leads to... The key point is that there is no present impact and will be no impact until an intervening step happens, which is an agency actually taking a specific action to implement the executive order. The only present harm that they are saying they are incurring is what they're characterizing in a sense as a chilling effect, that if we continue to provide these procedures at some point in the future, our funding may be terminated. And it's interesting, if you look at their supplemental brief, almost all of the cases they cite are First Amendment cases where ripeness standards are relaxed in light of that sort of chilling effect. These procedures are not protected speech or any other sort of protected conduct, and the mere fear that some agency in the future might take an action that would affect their funding is not enough to establish a ripe dispute. Can you address this debate about whether this is an as-applied versus a facial challenge? With respect to Mr. Purcell, I think he's simply confusing a question about the scope of relief with how you distinguish between a facial and an as-applied challenge. The scope of relief is governed by equitable principles by, for example, the Supreme Court's decision in CASA, which says that courts are limited to providing relief that redresses the injuries of the parties before the court, and that's a ceiling and you can't go farther. That has nothing to do with whether the challenge is a facial or as-applied challenge. What makes something a facial or as-applied challenge is the nature of your legal theory. Are you arguing that this provision is invalid in all of its applications and can't be applied to anyone, setting aside scope of relief questions? If the legal theory is valid as to me, it would be valid as to some other plaintiff. The nature of their challenge here is not there's some particular facts about our grants that make this executive order unlawful. They're arguing that the executive order is unlawful in all of its applications. The court can't grant relief consistent with CASA that goes that far, but that's a separate question. How about city and county of San Francisco in terms of the argument that essentially the president needs to have affirmative authority in order to change the funding? The president does not need to have affirmative authority to give instructions to his subordinates to analyze their authorities. That is the district court lost sight of some very basic principles about how our system of government works. Statutes often vest the executive branch with broad discretion as to how they get implemented, and the president, as the head of the executive branch under Article II, has the constitutional authority to direct them in the exercise of that discretion within the bounds of the law. The only separation of powers violation that occurred in this case was when the district court enjoined the president from exercising that core Article II power to direct his subordinates about how they should exercise their discretion within the bounds of existing law. That is all these executive orders do. Thank you. Thank you, Mr. McArthur. Thank you, Mr. Purcell. This matter is submitted.
judges: McKEOWN, PAEZ, BRESS